# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3691

_____

|  |  |  |
|---|---|---|
| Angel Dawn Dixon, a minor child by and through her natural mother, Misty Atkinson as next friend and natural guardian; Misty Atkinson, | * * * * * | |
| Appellants, | * | |
| v. | * * * | Appeal from the United States District Court for the District of Nebraska. |
| Crete Medical Clinic, P.C.; Russell Ebke, M.D.; City of Crete, Nebraska; Crete Municipal Hospital; Crete Area Medical Center, a non-profit corporation and subsidiary of BryanLGH Health Systems, Inc., | * * * * * * * | |
| Appellees. | * | |

_____

Submitted: April 13, 2007
Filed: August 17, 2007

_____

Before MELLOY, BOWMAN, and GRUENDER, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Misty Atkinson and her minor daughter, Angel Dixon (collectively, the Plaintiffs), sued the City of Crete, Nebraska; Crete Medical Clinic; Crete Municipal Hospital; Crete Area Medical Center; and Dr. Russell Ebke (collectively, the

Defendants) under Nebraska law,[1] alleging that the Defendants were negligent in providing the prenatal, labor and delivery, and post-delivery treatment associated with the birth of Angel Dixon on May 13, 1998. Pursuant to 28 U.S.C. § 636 and with the consent of the parties, the matter was tried before a Magistrate Judge,[2] who granted judgment in favor of the Defendants. The Plaintiffs appeal, and we affirm.

On December 1, 1997, Misty Atkinson learned that she was pregnant with Angel. On December 16, 1997, Dr. Ebke, a family-practice physician with training and experience in obstetrics and gynecology, examined Atkinson and noted that she was fifteen years old, stood five feet tall, weighed 142 pounds, and was roughly four months' pregnant. After a physical examination, Dr. Ebke concluded that Atkinson's pelvis was of adequate size and shape for a vaginal delivery. During this visit, Atkinson admitted to Dr. Ebke that she had smoked cigarettes, consumed alcohol, and used illegal drugs prior to her pregnancy, but she denied having engaged in any of this behavior after learning that she was pregnant.

Over the course of her pregnancy, Atkinson gained a significant amount of weight, which led Dr. Ebke on April 27, 1998, to recommend bed rest for Atkinson for the remainder of her pregnancy. Tests conducted on April 30 for pregnancy-induced hypertension were negative, and Dr. Ebke scheduled Atkinson for induction of labor to begin on May 12, 1998.

When she arrived at Crete Municipal Hospital for the delivery, Atkinson was briefed on the labor-induction process. Upon her admission, Atkinson asked a member of the nursing staff about a cesarean delivery, remarking that she "just

---

[1]Nebraska Hospital-Medical Liability Act, Neb. Rev. Stat. §§ 44-2801 to 44-2855; Political Subdivisions Tort Claims Act, id. §§ 13-901 to 13-926.

[2]The Honorable Thomas D. Thalken, United States Magistrate Judge for the District of Nebraska.

want[ed] to get it over with because [she] was really nervous" about the pain associated with a vaginal delivery. Tr. at 349. After a consultation with Dr. Ebke, during which he described his plan to conduct a trial induction of labor and to perform a cesarean only if the trial labor failed, Atkinson agreed to the induction, which Dr. Ebke commenced at 8:10 a.m. on May 12. At 2:00 p.m., Dr. Ebke checked Atkinson's progress; noted that it was normal; and ordered the administration of Pitocin, a drug used to induce labor or enhance a labor pattern. Atkinson testified that after the Pitocin was administered, she again requested a cesarean delivery because of painful contractions. At 4:50 p.m., Dr. Ebke heard a report from hospital staff regarding Atkinson's progress and ordered that the Pitocin be discontinued overnight so Atkinson could rest before the induction of labor was resumed the following day.

The next morning at 7:40, Dr. Ebke conducted another vaginal exam of Atkinson, noting that dilation had progressed to three centimeters and that effacement was at ninety percent. Because Atkinson's labor was progressing normally, Dr. Ebke proceeded to rupture Atkinson's uterine membranes (i.e., he broke her water), and he attached an electrode to Angel's scalp in order to monitor her heart rate throughout the remainder of the labor and delivery process. Dr. Ebke re-initiated the Pitocin at 7:50 a.m. on May 13, and he increased the Pitocin dosage at 9:00 a.m. Atkinson testified that after her water was broken, her contractions worsened and she again requested that a cesarean delivery be performed. Atkinson also testified that she requested an epidural, which was provided.

At 10:30 a.m., Dr. Ebke was updated on Atkinson's progress, including that the fetal heart rate (FHR) was elevated.[3] Dr. Ebke was not alarmed by the FHR, however,

---

[3]The normal range for an FHR is between 110 and 160 beats per minute. Tr. at 432. An FHR above 170 is considered mild tachycardia, while an FHR above 180 or 200 is considered severe tachycardia and may be a cause for alarm. Tr. at 676, 741. Fetal tachycardia may be caused by hypoxia, or low blood-oxygen delivery to the baby; maternal tachycardia; maternal fever or infection; or maternal anxiety. Tr. at 434, 676, 741–42, 1062.

because other factors, including acceptable short-term variability, indicated to him that the baby was not experiencing hypoxia. In addition, Dr. Ebke was aware that Atkinson continued to be fairly agitated and upset, which may have caused an increase in the FHR. At 10:40 a.m., the Pitocin was temporarily discontinued to allow Atkinson a brief respite from her contractions. A vaginal examination conducted by Dr. Ebke at 10:50 a.m. showed progress in dilation; thereafter, pain medication was administered and the Pitocin was restarted. At 11:40 a.m., Atkinson was upset and crying, and she stated to one of the nurses, "I can't do this anymore." Tr. at 756. This comment was noted in Atkinson's chart, but there was no indication in the chart that Atkinson had demanded a cesarean delivery in conjunction with the complaint. At 11:50 a.m., the FHR was still periodically reaching the 160s. At noon, the Pitocin was halted.

At 12:15 p.m., a member of the nursing staff reported to Dr. Ebke that Atkinson was exhibiting a "dysfunctional labor pattern" because the Pitocin had been stopped and restarted a number of times. At 12:55 p.m., Dr. Ebke reviewed the FHR himself and assessed the overall clinical situation, concluding that Atkinson was experiencing a great deal of anxiety but that the FHR was reassuring and short-term variability was acceptable. From 12:00 p.m. until 2:00 p.m., the nursing staff noted seven out of eight fifteen-minute periods with good variability, but they also noted questionable late decelerations in the FHR at 11:45 a.m. and at 2:00 p.m. Because a brief, late deceleration may be caused by, among other factors, epidural placement, maternal movement or repositioning, or fluid shifts, neither Dr. Ebke nor the nursing staff was concerned by these episodes. See Tr. at 772. Atkinson's vaginal examinations during this period showed that dilation had progressed from five to six centimeters and that effacement had reached one hundred percent. At 2:00 p.m., Dr. Ebke was notified that Atkinson was resting more comfortably and that her contractions were approximately five minutes apart. Dr. Ebke ordered that the Pitocin be resumed at a low level.

From 2:30 p.m. until delivery, Atkinson's labor-progress chart showed positive short-term variability and average to increased long-term variability. The FHR

increased from 160 to between 165 and 170 during one fifteen-minute period, but the elevation resolved. Because variability remained positive, the nursing staff did not believe that the brief episode of FHR elevation warranted a call to Dr. Ebke. From 2:30 p.m. onward, Atkinson had "very good progression" of labor. Tr. at 854.

Once the pushing phase of her labor began, Atkinson protested, "[G]et it out . . . I [can't] handle it anymore." Tr. at 351; see also Tr. at 842, 856. The nursing staff, however, did not believe that Atkinson's complaint amounted to a request for a cesarean delivery. Rather, the staff believed that Atkinson was expressing the fear, anxiety, and pain frequently expressed during a typical vaginal delivery.

At about 3:30 p.m., Dr. Ebke arrived in the delivery room after having been informed that Atkinson was completely dilated. Based on his opinion that Atkinson's labor pattern was acceptable and on his earlier physical examinations, Dr. Ebke was not concerned about a condition called cephalopelvic disproportion (CPD), where a baby's head is too large to descend safely through the mother's pelvis. By 4:50 p.m., Atkinson had stopped pushing effectively so Dr. Ebke determined that a vacuum extractor should be utilized to aid in completing the delivery. After Angel's head began crowning, Dr. Ebke positioned the vacuum extractor on Angel's head. Dr. Ebke then waited for a contraction and, with a single pull, delivered Angel's head. Tr. at 1028–29. Meconium[4] was observed on Angel's nose and mouth, which Dr. Ebke removed by suction before continuing with the delivery.

At this point, Dr. Ebke experienced some difficulty in delivering Angel's body, and he instructed the nurses to re-position Atkinson, thus allowing additional space in the birth canal to deliver Angel's shoulders. Dr. Ebke delivered Angel at 4:54 p.m. on May 13, 1998, and she weighed six pounds, six ounces. Immediately after her birth, Angel had trouble breathing. Because Dr. Ebke had already removed visible

---

[4]Meconium is excrement in the fetal intestinal tract that is discharged during the delivery process.

meconium from Angel's mouth and nose, he used an instrument to examine Angel's airway below her vocal chords and remove any additional meconium she may have aspirated. The first insertion of the instrument yielded some meconium, but the second insertion was clean. As a precaution, Dr. Ebke applied a device to push additional oxygen into Angel's lungs, but Angel was stable and was breathing on her own. Angel's one-minute Apgar[5] score was three, while her five-minute Apgar score was seven. Angel was provided enriched oxygen and was transported to the nursery. Because meconium was present below Angel's vocal chords and because she continued to experience periods of rapid breathing, Dr. Ebke directed that Angel be transferred to St. Elizabeth's Hospital, which was equipped to provide more specialized care.

In the meantime, the nursing staff had prepared Atkinson's placenta for delivery to the laboratory. The staff noted that the placenta appeared abnormal, with an umbilical cord that was small in diameter. The medical records also noted that Angel experienced "trauma" during the delivery. Tr. at 429–30. This comment was based on Angel's "large caput"—the overlapping of the baby's skull bones caused by the forces of labor during a vaginal delivery. Tr. at 430; 672–73. While some swelling of the scalp and overlapping of the skull bones are normal for a baby of a first-time mother, Tr. at 431, 673, a large caput is also consistent with CPD, Tr. at 432.

On November 26, 2006, the Plaintiffs filed a lawsuit, claiming that Dr. Ebke was negligent by 1) failing to consider or act on Atkinson's requests for a cesarean delivery, 2) failing to recognize that fetal distress and maternal labor patterns indicated that a cesarean delivery was medically required, and 3) performing a vacuum delivery

---

[5]An Apgar score, ranging from zero to ten, is used to assess the health of a newborn immediately after childbirth. An Apgar score of three is not considered unusual for a newborn who has aspirated meconium and a score of seven is considered normal for a newborn. Tr. at 1119–20.

rather than a cesarean delivery.  In addition, the Plaintiffs claimed that the other Defendants, through their employees, breached the applicable standard of care by failing to identify the fetal distress and failing to notify Dr. Ebke or the chain of command that a cesarean was medically necessary.

In support of their claims, the Plaintiffs presented testimony from, among others, Dr. Abraham Scheer and Dr. Michael Cardwell.  Dr. Scheer, a pediatric and adult neurologist, analyzed Angel's medical records, reviewed a neurosurgical consultation report, and conducted a neonatal neurological examination of Angel two days after her birth.  Testifying as Angel's treating physician and as an expert witness, Dr. Scheer stated that Angel's face was bruised and swollen upon her admission to St. Elizabeth's and that her head circumference was normal.  Dr. Scheer recommended that Angel remain in the neonatal intensive-care unit (NICU) at St. Elizabeth's for continued observation.  Dr. Scheer testified that upon her admission to St. Elizabeth's, Angel appeared to have aspirated meconium, suffered seizures, probably lost oxygen to her brain (a condition called "hypoxic encephalopathy"), and sustained a head fracture that may have been the cause of her seizures.  Tr. at 63.  Dr. Scheer also noted that Angel was "not fixing and following" and was "very, very floppy."  Tr. at 68–69.  He suggested these symptoms could be attributable to the head fracture, the anti-seizure medication, the hypoxic encephalopathy, or the meconium aspiration.  Tr. at 71.  His review of the FHR monitoring strips led Dr. Scheer to opine that over the course of labor and delivery, Angel had suffered some oxygen deprivation as reflected by the periods of tachycardia in the monitoring strips.

Dr. Scheer examined Angel again on July 16, 1998.  An MRI revealed atrophy, or shrinkage, in the right hemisphere of Angel's brain, a condition Dr. Scheer testified was consistent with hypoxia.  Another MRI on April 28, 1999, indicated to Dr. Scheer that the left hemisphere of Angel's brain was growing normally, while the right hemisphere continued to appear atrophied and exhibited hygromas, or fluid-filled areas.  Dr. Scheer concluded that Angel had cerebral palsy.  Tr. at 129.

On June 1, 2000, Dr. Scheer noted that Angel was severely microcephalic—Angel's head circumference was abnormally small, typically signifying developmental difficulties and mental retardation. Tr. at 130–31. Dr. Scheer testified that microcephaly may be caused by, among other factors, genetic, anatomical, or metabolic problems; hypoxia; and maternal drug use. Tr. at 182–83. Dr. Scheer did not rule out a stroke or stroke-like event as the cause of Angel's microcephaly. Tr. at 129. On November 6, 2000, Dr. Scheer confirmed that Angel remained microcephalic and that the circumference of her head was significantly below normal. Tr. at 133, 135–37.

Dr. Scheer testified that in his opinion, the suction from the vacuum extractor used to remove Angel from the birth canal as well as the trauma and hypoxia Angel experienced during the labor and delivery process caused her neurological condition. Tr. at 167–172. He attributed Angel's neurological condition to the Defendants' negligence. Dr. Scheer opined that had Angel been delivered by cesarean, her head size would be normal as would her growth and development. Tr. at 168.

Dr. Cardwell, an obstetrician-gynecologist and perinatology specialist, reviewed the medical records and the various depositions related to the labor and delivery treatment provided by the Defendants. Dr. Cardwell testified that Atkinson had a protracted active phase of labor because she was slow to dilate, a factor that may signal CPD. Tr. at 427. According to Dr. Cardwell, the FHR monitoring strips recorded during Atkinson's labor began to show a non-reassuring pattern. Specifically, Dr. Cardwell interpreted the FHR monitoring strips as showing tachycardia and decreased variability at approximately 12:30 p.m. on May 13, indicating that at that point Dr. Ebke should have known a cesarean delivery was required. Tr. at 428. Dr. Cardwell testified that Dr. Ebke violated the standard of care by 1) failing to consider or act on Atkinson's request for a cesarean delivery; 2) failing to recognize that Atkinson's protracted active phase of labor, the slow descent of the baby through the birth canal, and the non-reassuring FHR all suggested that a cesarean delivery was medically indicated; 3) attempting a vacuum delivery instead of the medically

indicated cesarean delivery; and 4) failing to call a pediatrician to attend to Angel based on the non-reassuring FHR and the presence of meconium at delivery. Tr. at 442–43, 445. Likewise, Dr. Cardwell testified that the nursing staff (and the hospital through its nursing staff) had a duty to notify Dr. Ebke about Atkinson's requests for a cesarean delivery and should have recognized that the protracted active labor and non-reassuring FHR were reasons to either insist that Dr. Ebke perform a cesarean delivery or notify the chain of command that Dr. Ebke refused to perform a cesarean delivery. Tr. at 449–52.

To rebut the Plaintiffs' claims, the Defendants presented the testimony of Nurse Martha Graf, Dr. James Elston, Dr. Michael Levine, Dr. John MacDonald, and Dr. Gerald Bradley Schaefer. Nurse Graf, a registered nurse certified in obstetric nursing, maternal/newborn nursing, and fetal monitoring, reviewed the Plaintiffs' medical records and the deposition testimony of several witnesses. She opined that the nursing staff providing Atkinson's labor and delivery care satisfied the applicable standard of care. Nurse Graf testified that members of the nursing staff are responsible for monitoring a baby's heart-rate variability during the labor and delivery process. Moderate variability indicates to the staff that the baby's brain is well-oxygenated, while minimal variability should alert nursing staff to a potential problem with oxygenation. Tr. at 904–05. The nursing staff also monitors the FHR. According to Nurse Graf, acceleration occurs if the FHR exceeds 160 for less than ten minutes, and it may be caused by maternal temperature, maternal or fetal activity, or stress to the mother or fetus. Tr. at 906. Tachycardia occurs if the FHR exceeds 160 for longer than ten minutes, and it also may be caused by maternal factors. If the FHR reaches 180 to 200, the nursing staff should be concerned about the baby's condition. After reviewing the medical charts and the FHR monitoring strips, Nurse Graf testified that although there were periods when Angel's FHR was above 160, there was no reason for concern because the episodes were brief and could be explained by the total clinical picture—specifically, that Atkinson was feverish or anxious during those periods. Tr. at 909–10. Likewise, the periods of deceleration were not alarming in Atkinson's case given the total clinical picture. Tr. at 911. Nurse Graf testified that

-9-

the assistance given to Dr. Ebke by the nursing staff in placing and operating the vacuum extractor was within the applicable standard of care. Tr. at 924–25. Nurse Graf's review of Atkinson's labor-process chart revealed that Atkinson's labor was shorter than average for a first-time mother and would not have caused her any concern. Tr. at 919–21. Nurse Graf also testified that in her clinical experience, mothers typically complain about their inability to continue with the labor process on account of pain, exhaustion, anxiety, and fear—particularly when the labor process has advanced almost to delivery. Tr. at 915–16. The nursing staff is trained to offer the mother pain control, reassurance, and encouragement during this period of labor. Tr. at 916. Based on her review of the medical records, Nurse Graf found no evidence that the nursing staff should have suggested to Dr. Ebke that a cesarean delivery was necessary or that the nursing staff should have invoked the chain of command. Tr. at 922–23.

Dr. Elston, an obstetrician-gynecologist emeritus with training and experience in performing vaginal and cesarean deliveries, diagnosing CPD, and using vacuum extractors, testified that the FHR monitoring strips revealed variability and FHR over the course of the labor and delivery "within normal limits" that did "not indicate any fetal jeopardy or problem." Tr. at 696. Dr. Elston explained that the FHR is affected by, for example, medications, maternal contractions, and maternal activity or inactivity. During some periods when Angel's FHR was elevated, Atkinson's heart rate was also elevated. Tr. at 680, 741–42. Dr. Elston also concluded that Angel did not suffer from hypoxia because the umbilical cord pH was normal, Angel's five-minute Apgar score was normal, and Angel did not experience the multiple-organ impairment typically associated with hypoxia. Tr. at 663. In Dr. Elston's opinion, Atkinson's labor was not protracted because it was shorter than would be expected for a first-time mother with an epidural. Moreover, Dr. Elston opined that Dr. Ebke's use of the vacuum extractor was appropriate given that Atkinson was complaining of pain and exhaustion and Angel was well-positioned along the birth canal. Tr. at 710–12. Based on his review of the medical evidence and on his training and experience, Dr. Elston ultimately concluded that Dr. Ebke and the nursing staff met the applicable

-10-

standards of care in treating the Plaintiffs and that the Defendants had no duty to perform a cesarean delivery in the circumstances.  Tr. at 702–03, 705–06.

Dr. Levine, a maternal-fetal medicine specialist with training and experience in treating problem pregnancies and in interpreting FHR monitoring strips, also reviewed the medical records and depositions.  Dr. Levine analyzed the FHR monitoring strips and concluded that although periods of minimal, moderate, and marked variability were present, the majority of the monitoring strips showed moderate variability, which is preferred.  Tr. at 1057, 1059–60.  Dr. Levine did not identify any portion of the monitoring strips that would indicate to him a cesarean delivery was necessary.  Tr. at 1060.  According to Dr. Levine, the FHR monitoring strips, although exhibiting some periods of mild tachycardia and some problematic patterns, would not have caused him concern.  Dr. Levine testified that Atkinson's dilation proceeded normally given that the Pitocin was started and stopped more than once. Based on his assessment of the FHR, variability, and labor progression (as measured by dilation and Angel's movement through the birth canal), Dr. Levine opined that Dr. Ebke and the nursing staff met applicable standards of care and at no time was a cesarean delivery necessary.  Tr. at 1074.  Dr. Levine testified that Dr. Ebke properly used the vacuum extractor based on Atkinson's complaints of exhaustion and the ineffectiveness of her pushing.  Tr. at 1083–84.

Dr. MacDonald, a pediatric neurologist, diagnoses, treats, and searches for the cause of neurological problems in his patients. Dr. MacDonald reviewed the medical records (including the prenatal and ongoing treatment records for Angel), as well as reports and depositions of experts, treating physicians, and other witnesses.  In Dr. MacDonald's opinion, Angel's neurological problems could not be attributed to the labor and delivery care provided by the Defendants.  Tr. at 786. Rather, Dr. MacDonald testified that Angel's problems may have been caused by Atkinson's drug use during the first trimester of her pregnancy or by a viral infection contracted by Atkinson and passed to Angel just prior to Angel's birth.  Tr. at 788–91.  Dr. MacDonald testified that a number of viruses can cause damage to a fetus or

exacerbate a pre-existing disorder.  Tr. at 790.  After reviewing a May 14, 1998, analysis of Angel's spinal fluid, Dr. MacDonald testified that Angel's white blood cell count was 101.  Tr. at 791.  According to Dr. MacDonald, a normal white blood cell count for a newborn would have been 20 to 25 and a count above 30 would have been a cause for concern.  Tr. at 792.  A second spinal-fluid analysis on May 26, 1998, showed a normal white blood cell count.  Tr. at 792.  Dr. MacDonald concluded from this evidence that Angel had an infection of the nervous system.  Tr. at 791.  Dr. MacDonald also testified that seizures like those suffered by Angel may be a sign of meningitis or encephalitis.  Tr. at 791.  In addition, Dr. MacDonald testified that Angel may have inherited a blood coagulation disorder, which may have caused one stroke-like event just prior to her birth and another such event in 2003.  Tr. at 794–99, 802–03, 808–10.  According to Dr. MacDonald, a stroke-like event could cause neurological symptoms that are limited to one side of the brain, as in Angel's case.  Tr. at 794.  Dr. MacDonald testified that the MRI taken of Angel's brain when she was two months' old is consistent with his conclusion.  Tr. at 796, 803.  In contrast, an injury due to hypoxia would affect blood flow to both sides of the brain.  Tr. at 806–07. In short, Dr. MacDonald opined that the evidence of Atkinson's illness before labor and the analyses of Angel's spinal fluid suggested that a viral infection was either a major or contributing cause of Angel's neurological condition and that a blood-coagulation disorder may also have contributed to a stroke-like event causing Angel's injuries. Tr. at 793, 797–99.

Dr. Schaefer, a professor of pediatrics who is certified in clinical genetics, pediatrics, and pediatric endocrinology, reviewed the medical records and testimony, conducted a medical examination of Angel, and had blood samples from Angel and Atkinson analyzed.  According to Dr. Schaefer, Angel's neurological condition was not due to the labor and delivery treatment provided by the Defendants, but to a combination of genetic and environmental factors including: 1) prenatal exposure to multiple teratogens, such as drugs, chemicals, or infections that can cause birth defects; 2) two specific genetic mutations; and 3) a family history of certain physiological problems, including a possible blood-coagulation disorder.  Tr. at 1191,

-12-

1193, 1197–1201. Dr. Schaefer considered particularly important Atkinson's earlier miscarriages, her blood-clotting disorder, the abnormality of the placenta, and studies showing that Angel suffered a stroke-like event around the time of her birth. Tr. at 1193, 1195–1201.

Following the bench trial, the Magistrate Judge ruled in favor of the Defendants, finding that the Plaintiffs "failed to establish . . . that they sustained any injuries due to a breach of the standard of care by the defendants." Mem. & Order of Sept. 20, 2006, at 32 (Mem. & Order). In reaching this conclusion, the Magistrate Judge credited "the testimony of the defendants' witnesses and expert witnesses about the nature and causes of [Angel's] . . . injuries." Id.

On appeal, the Plaintiffs first argue that the Magistrate Judge erred when he "entered judgment in favor of" the Defendants. Br. of Appellants at 17. Although it is not altogether clear from their brief, the thrust of the Plaintiffs' first argument appears to be that the Magistrate Judge made a number of errors in his factual findings. Findings of fact, whether based on testimony, documentary evidence, or inferences from other facts, will not be set aside unless they are clearly erroneous. Fed. R. Civ. P. 52(a); Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). If the factfinder's account of the evidence "is plausible in light of the record viewed in its entirety," we will not reverse even if we would have viewed the evidence differently had we been sitting as the trier of fact. Anderson, 470 U.S. at 574. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. If a factual finding is supported by substantial evidence on the record, it is not clearly erroneous. Robinson v. Geico Gen. Ins. Co., 447 F.3d 1096, 1101 (8th Cir. 2006).

In a medical malpractice action under Nebraska law, the plaintiff bears the burden of establishing "the generally recognized medical standard involved; that there was a deviation from that standard by the defendant; and that such deviation was the proximate cause of plaintiff's injury." Saporta v. State, 368 N.W.2d 783, 786 (Neb. 1985) (per curiam) (quoting Anderson v. Moore, 275 N.W.2d 842, 849 (Neb. 1979)). "[T]he ultimate determination of whether a party deviated from the standard of care and was therefore negligent is a question of fact." Cerny v. Cedar Bluffs Junior/Senior Pub. Sch., 628 N.W.2d 697, 704–05 (Neb. 2001).

The Plaintiffs argue that the Defendants breached the applicable standard of care by refusing to grant Atkinson's repeated requests for a cesarean delivery. The Magistrate Judge found, however, that after a consultation with Dr. Ebke and the nursing staff, Atkinson consented to the induction of labor and a vaginal delivery. Her complaints to the nursing staff to "just take it out" because she "c[ould]n't do this" were uttered during particularly painful, high-stress periods of the labor and delivery process, and these comments could not reasonably be construed as requests for a cesarean delivery. Nurses Yank and Graf testified that it is very common for women in labor to make remarks or demands like Atkinson's and that such statements do not compel a cesarean delivery in response. Tr. at 857, 916. Moreover, the Magistrate Judge noted there was no evidence that Atkinson renewed her demands for a cesarean delivery during less stressful periods of her labor. Finally, Dr. Elston testified that the Defendants met the standard of care regarding a request for a cesarean delivery in all respects and that the applicable standard does not contemplate "[cesarean]-section on demand." Tr. at 653. The Magistrate Judge's finding that the Defendants "did not breach the standard of care with regard to any request for cesarean delivery by Ms. Atkinson" is supported by substantial evidence in the record and is not clearly erroneous. Mem. & Order at 30.

The Plaintiffs also argue that the Defendants breached the applicable standard of care by failing to recognize that a cesarean delivery was medically necessary because Atkinson's labor was not progressing and because the FHR monitoring strips

showed that Angel was in distress. According to the Plaintiffs, the Magistrate Judge clearly erred by finding otherwise. The Magistrate Judge found that Atkinson's labor pattern was not unusual as compared with other first-time mothers and that the monitoring strips evidenced an FHR within normal ranges. These findings were based on evidence that Dr. Ebke and the nursing staff closely monitored Atkinson's labor progress and charted the duration of her labor, the descent of the fetus through the birth canal, and the FHR as measured by the monitoring strips. Based on the testimony at the bench trial, the Magistrate Judge found that these measurements, which were influenced by the use of Pitocin, maternal stress, and the administration of medications to address Atkinson's complaints of pain, were within normal ranges in those circumstances. Dr. Elston testified that 1) the FHR monitoring strips were within normal limits and did not indicate any fetal distress, 2) the duration of Atkinson's labor was well below average, 3) the progress of labor was acceptable, and 4) the nursing staff accurately interpreted the FHR monitoring strips. Tr. at 696–701. Nurse Graf testified that Atkinson's labor was not protracted and that the brief periods of fetal tachycardia were likely due to maternal anxiety. Tr. at 917, 921. Dr. Levine disputed the Plaintiffs' experts' interpretation of the FHR monitoring strips, opining that he had reviewed strips of a similar nature "on a regular basis with no evidence of concern." Tr. at 1060. With respect to the progress of labor and the FHR monitoring strips, Dr. Elston, Dr. Levine, and Nurse Graf all testified that the Defendants met the standard of care throughout the labor and delivery process. Tr. at 662, 718, 1052–53, 1071, 901. The Magistrate Judge's finding that the Defendants "did not breach the standard of care by failing to recognize a cesarean delivery was medically indicated by Ms. Atkinson's labor pattern and fetal distress" is supported by substantial evidence in the record and is not clearly erroneous. Mem. & Order at 31.

The Plaintiffs also claim that Dr. Ebke breached the applicable standard of care by performing a vacuum delivery rather than a cesarean delivery. The Magistrate Judge disagreed, finding that "[a] cesarean delivery was not medically indicated by the length of labor, descent of the baby, fetal heart rates, fetal condition known to the care givers or maternal condition." Id. at 31. The Magistrate Judge also found that

-15-

the Plaintiffs failed to establish that Dr. Ebke's technique in utilizing the vacuum extractor breached the standard of care. Id. In making these findings, the Magistrate Judge specifically "credit[ed] and believe[d] the testimony of the defendants' witnesses and expert witnesses over the plaintiffs' witnesses, where the witnesses were inconsistent." Id. The Defendants' experts included Dr. Elston, who stated that there was nothing in Atkinson's chart indicating that the vaginal delivery should have been abandoned in favor of a cesarean delivery, Tr. at 716, 742, and Dr. Levine, who testified that the Defendants "met the standard of care . . . during the . . . immediate delivery with vacuum extractor and then the resuscitation of meconium aspiration in the delivery room," Tr. at 1052. The Magistrate Judge's finding that Dr. Ebke did not breach the standard of care in performing a vacuum delivery is supported by substantial evidence in the record and is not clearly erroneous.

Finally, the Plaintiffs contend that the only credible explanation for Angel's neurological condition is the explanation advanced by their expert witnesses, namely that Angel's condition is a direct result of the Defendants' negligence during the labor and delivery process. According to the Plaintiffs, then, the Magistrate Judge erred when he found that the Plaintiffs failed to meet their burden of proof regarding the proximate cause of Angel's condition. Crediting the Defendants' evidence, the Magistrate Judge found that Angel's condition was likely the result of "environmental and genetic factors," rather than "the care received during labor and delivery." Mem. & Order at 32. The evidence in support of the Magistrate Judge's finding includes 1) Dr. Elston's testimony that the cause of Angel's condition was not a problem during delivery and that Angel's condition did not fall within professional guidelines for hypoxia, Tr. at 663, 715; 2) Dr. MacDonald's testimony that the treatment provided before, during, and after labor and delivery did not contribute "at all" to Angel's condition and that her condition was not associated with hypoxia during labor and delivery but with a stroke-like event shortly before delivery, Tr. at 786, 789, 811; and 3) Dr. Levine's testimony that he did not identify any evidence of fetal hypoxia on the FHR monitoring strips, Tr. at 1081–82. Although the Plaintiffs and their experts attributed Angel's condition to the Defendants' negligence during the labor and

delivery process, the Defendants and their experts presented ample evidence to refute the Plaintiffs' claims. The Magistrate Judge's choice between two permissible views of the evidence cannot be clearly erroneous. See Anderson, 470 U.S. at 574. The Magistrate Judge's finding that the Plaintiffs failed to carry their burden regarding proximate cause is supported by substantial evidence in the record and is not clearly erroneous.

The Plaintiffs have demonstrated, at most, that they disagree with the Magistrate Judge's factual findings, but they have fallen far short of demonstrating that those factual findings were clearly erroneous. "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." Anderson, 470 U.S. at 575. We reject the Plaintiffs' arguments regarding the Magistrate Judge's factual findings.

The Plaintiffs' next argument on appeal is that the Magistrate Judge erred by "rel[ying] upon opinions which were not to a reasonable degree of medical certainty" in making his findings regarding the proximate cause of Angel's injuries. Br. of Appellants at 25. The Plaintiffs offer several examples of expert testimony that they contend "did not have the appropriate degree of definiteness" to merit the Magistrate Judge's reliance. Id. The Plaintiffs submit no evidence, however, that they objected during the bench trial to the testimony about which they now complain. "The failure to object to an[] error . . . leaves the appellate court with the power to notice only plain error." Rahn v. Hawkins, 464 F.3d 813, 819 (8th Cir. 2006). Under plain error review, an error not called to the trial court's attention by a contemporaneous objection will be grounds for reversal only if the error prejudiced the substantial rights of a party and would "seriously affect the fairness, integrity or public reputation of judicial proceedings" if left uncorrected. United States v. Olano, 507 U.S. 725, 736 (1993) (quotations omitted). Although Olano addressed plain error in the context of a criminal proceeding, "an unpreserved error in the civil context must meet at least the

Olano standard to warrant correction." Wiser v. Wayne Farms, 411 F.3d 923, 927 (8th Cir. 2005). The error alleged by the Plaintiffs is that the Magistrate Judge considered expert medical testimony that the Plaintiffs now contend was impermissibly speculative, but to which the Plaintiffs did not object at trial. Assuming for the sake of argument that the Magistrate Judge's reliance on this expert testimony was plain error, holding Plaintiffs accountable for their decision not to object to the testimony would neither prejudice their substantial rights nor "seriously affect the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 736. Accordingly, we reject the Plaintiffs' claim of error.

The Plaintiffs next argue that the Magistrate Judge erred when he found that the opinions of the Plaintiffs' medical experts were "lacking in foundation with regard to . . . Atkinson's labor pattern." Mem. & Order at 31. According to the Plaintiffs, their experts possessed the training, experience, and expertise to opine on the medical issues in this case and the Magistrate Judge erred in concluding that their experts were not qualified. The Plaintiffs misinterpret the Magistrate Judge's statement. Viewing the statement in context, it is apparent that the Magistrate Judge was referring to an absence of *factual* foundation for the opinions offered by the Plaintiffs' medical experts. The Magistrate Judge was not concluding that the Plaintiffs' experts lacked the medical training, experience, or expertise to render their opinions. In connection with the statement regarding the Plaintiffs' experts, the Magistrate Judge found that Dr. Ebke and the nursing staff "closely monitored" Atkinson's labor pattern, noting that it was affected by a number of variables including maternal stress, pain medication, and the Pitocin used to induce labor. Id. The court agreed with the Defendants' experts that the labor pattern was not unusual compared with labor patterns of other first-time mothers in similar circumstances. The Magistrate Judge credited the Defendants' experts and found that the conditions during labor did not indicate a cesarean delivery was required under the applicable standard of care. Considering the Magistrate Judge's statement in context, it is obvious that he was simply explaining his decision to credit the testimony of the Defendants' expert witnesses rather than the Plaintiffs' experts with respect to Atkinson's labor pattern.

As the finder of fact, it was not error for the Magistrate Judge to make this choice, rather it was his obligation. And a factfinder's choice between "two permissible views of the evidence . . . cannot be clearly erroneous." Anderson, 470 U.S. at 574.

The Plaintiffs' final argument on appeal is that the Magistrate Judge erred "when he relied on erroneous evidence which was not even contained in the record." Br. of Appellants at 32. In the Order entering judgment in favor of the Defendants, the Magistrate Judge stated, "Dr. Scheer testified Angel Dixon may have had a brain infarct, or stroke, which was not ruled out as a cause of her microcephaly." Mem. & Order at 17. In support of this statement, the Magistrate Judge cited Dr. Scheer's deposition testimony. The Plaintiffs argue that Dr. Scheer's deposition was not part of the record and that the Magistrate Judge erred by considering it. Assuming for the sake of argument that the Magistrate Judge erred in considering Dr. Scheer's deposition testimony, any such error is harmless because the opinion expressed in the deposition was reiterated by Dr. Scheer during his testimony at the trial. Dr. Scheer testified that Angel experienced "a left hemiparesis," or left-side paralysis, that he felt was "secondary to an infarct, a cortical infarct," or stroke-like event. Tr. at 129. Additionally, the medical records prepared by Dr. Scheer as Angel's treating physician were admitted into evidence without objection, and those records indicated that Dr. Scheer believed Angel "probably [had] a cortical infarct." App. of Appellees at 81. Dr. MacDonald testified that in his opinion, Angel suffered a stroke in the days immediately preceding her birth. Tr. at 795, 810. Thus, even if the Magistrate Judge erred by relying on evidence not properly before him, there was ample evidence in the record to support the court's findings regarding the likely cause of Angel's neurological condition.

For the foregoing reasons, the judgment is affirmed.

_____

-19-